Slip Op. 20-88

## UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| CSC SUGAR LLC, | |
| Plaintiff, | |
| v. | Before: Leo M. Gordon, Judge |
| UNITED STATES, | Court No. 20-00016 |
| Defendant. | |

## OPINION

[Denying Plaintiff's motion for judgment on the agency record.]

Dated: June 25, 2020

Jeffrey S. Neeley, Nithya Nagarajan, Michael Klebanov, and Joseph S. Diedrich Husch Blackwell, LLP, of Washington, DC for Plaintiff CSC Sugar LLC.

Douglas G. Edelschick, Senior Trial Counsel, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, of Washington, DC for Defendant United States. With him on the brief were Joseph H. Hunt, Assistant Attorney General, Jeanne E. Davidson, Director, and Reginald T. Blades, Jr., Assistant Director. Of counsel on the briefs was Paul K. Keith, Attorney, U.S. Department of Commerce, Office of the Chief Counsel for Trade Enforcement and Compliance of Washington, DC.

Robert C. Cassidy, Jr., Charles S. Levy, James R. Cannon, Jr., and Jonathan M. Zielinsky, Cassidy Levy Kent (USA) LLP, of Washington, DC for Defendant-Intervenors the American Sugar Coalition, American Sugar Cane League, American Sugarbeet Growers Association, American Sugar Refining, Inc., Florida Sugar Cane League, Rio Grande Valley Sugar Growers, Inc., Sugar Cane Growers Cooperative of Florida, and the United States Beet Sugar Association.

Rosa S. Jeong, Irwin P. Altschuler, and Sonali Dohale, Greenberg Traurig, LLP, of Washington, DC for Defendant-Intervenor Cámara Nacional de Las Industrias Azucarera y Alcoholera.

Gordon, Judge: Before the court is the USCIT Rule 56.2 motion of Plaintiff CSC

Sugar LLC ("Plaintiff" or "CSC Sugar") for judgment on the administrative record

challenging the U.S. Department of Commerce's ("Commerce") final determination in

Sugar from Mexico, 85 Fed. Reg. 3,620 (Jan. 22, 2020) (Amendment to Agreement

Suspending the Antidumping Duty Investigation) ("2020 AD Amendment").[1] See Pl.'s Mot.

for J. on the Agency R. under CIT Rule 56.2, ECF No. 31 ("Pl.'s Br."); see also Def.'s

Resp. in Opp'n to Pl.'s Rule 56.2 Mot. for J. on the Agency R., ECF No. 34 ("Def.'s Resp.");

Resp. of Def.-Intervenor Cámara Nacional de Las Industrias Azucarera y Alcoholera in

Opp'n to Pl.'s Mot. for J. on the Agency R., ECF No. 35, ("Cámara Resp."); Def.-Intervenor

Am. Sugar Coalition's Resp. to Pl.'s 's Mot. for J. on the Agency R., ECF No. 36 ("ASC

Resp."); Reply Memorandum in Support of Pl.'s Mot. for J. on the Agency R., ECF No. 38

("Pl.'s Reply").[2] The court has jurisdiction over this matter pursuant to Section

516A(a)(2)(B)(iv) of the Tariff Act of 1930, as amended, 19 U.S.C. § 1516a(a)(2)(B)(iv)

(2012),[3] and 28 U.S.C. § 1581(c) (2012). For the reasons set forth below, the court denies

Plaintiff's motion, and sustains the 2020 AD Amendment.

## I. Background

In 2014, pursuant to a petition filed by the American Sugar Coalition, and its

members (collectively, "ASC"), Commerce and the U.S. International Trade Commission

conducted an investigation as to whether imports of sugar from Mexico were being sold

[1] CSC Sugar also filed a parallel action, Court No. 20-00017, challenging Commerce's amendment to the Countervailing Duty ("CVD") Suspension Agreement ("2020 CVD Amendment"), which is addressed in this Court's decision, Slip Op. 20-89, also issued this date.
[2] All citations to parties' briefs and the agency record are to their confidential versions unless otherwise noted.
[3] Further citations to the Tariff Act of 1930, as amended, are to the relevant provisions of Title 19 of the U.S. Code, 2012 edition.

at less than fair value, and whether such imports were injurious to the U.S. industry. After Commerce issued a preliminary determination that sugar from Mexico was being sold, or was likely to be sold, in the United States at less than fair value, Commerce, on behalf of the United States Government, and the Government of Mexico ("Mexico") negotiated and signed a suspension agreement. See Sugar From Mexico, 79 Fed. Reg. 78,039 (Dep't of Commerce Dec. 29, 2014) (suspension of AD investigation) ("AD Agreement").

In 2017, Commerce and Mexico negotiated amendments to the AD Agreement. See Sugar from Mexico, 82 Fed. Reg. 31,945 (Dep't of Commerce July 11, 2017) (amendment to AD Suspension Agreement) ("2017 AD Amendment"). Among other changes, this amendment altered the definition of "refined sugar." See id. (amending definition of "refined sugar" to consist of sugar with polarity of 99.2 degrees and above, instead of 99.5 degrees and above). In response, CSC Sugar commenced an action challenging the 2017 AD Amendment on procedural and substantive grounds. CSC Sugar demonstrated that Commerce failed to maintain a complete record including memoranda of ex parte meetings as required pursuant to 19 U.S.C. § 1677f(a)(3). The court issued two decisions ultimately vacating the 2017 AD Amendment. See CSC Sugar v. United States, 42 CIT ___, 317 F. Supp. 3d 1334 (2018); CSC Sugar v. United States, 43 CIT

___, 413 F. Supp. 3d 1318 (2019) ("CSC Sugar II"). The court assumes familiarity with these decisions.

Thereafter, Commerce commenced a proceeding to consider and adopt a new AD amendment. See AD Statutory Assessment Memo at 1–2, PD[4] 101 (describing negotiation, notice and comment process, and signing of 2020 AD Amendment). CSC Sugar now challenges the 2020 AD Amendment arguing (1) that Commerce did not comply with recordkeeping requirements during the negotiation of the 2020 AD Amendment; (2) that the record does not support the need to both revise the polarity standards for raw and refined sugar and incorporate a bulk shipment requirement; and (3) that Commerce did not provide a complete analysis of the public interest requirement under 19 U.S.C. § 1673c(a)(2)(B). See generally Pl.'s Br.

## II. Standard of Review

The court sustains Commerce's "determinations, findings, or conclusions" unless they are "unsupported by substantial evidence on the record, or otherwise not in accordance with law." 19 U.S.C § 1516a(b)(1)(B)(i). More specifically, when reviewing agency determinations, findings or conclusions for substantial evidence, the court assesses whether the agency action is reasonable given the record as a whole. Nippon Steel Corp v. United States, 458 F.3d 1345, 1350–51 (Fed. Cir. 2006). Substantial evidence has been described as "such relevant evidence as a reasonable mind might

---

[4] "PD ___" refers to a document contained in the public administrative record, which is found in ECF No. 29-1, unless otherwise noted. "CD ___" refers to a document contained in the confidential administrative record, which is found in ECF No. 29-2, unless otherwise noted.

accept as adequate to support a conclusion." DuPont Teijin Films USA v. United States, 407 F.3d 1211, 1215 (Fed. Cir. 2005) (quoting Consol. Edison Co. v. NLRB, 305 U.S. 197, 229 (1938)). Substantial evidence has also been described as "something less than the weight of evidence, and the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's findings from being supported by substantial evidence." Consolo v. Fed. Mar. Comm'n, 383 U.S. 607, 620 (1966).

Fundamentally, though, "substantial evidence" is best understood as a word formula connoting a reasonableness review. 3 Charles H. Koch, Jr., Administrative Law and Practice § 9.24[1] (3d ed. 2020). Therefore, when addressing a substantial evidence issue raised by a party, the court analyzes whether the challenged agency action "was reasonable given the circumstances presented by the whole record." 8A West's Fed. Forms, National Courts § 3.6 (5th ed. 2020).

Separately, the two-step framework provided in Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc., 467 U.S. 837, 842–45 (1984), governs judicial review of Commerce's interpretation of the antidumping duty statute. See United States v. Eurodif S.A., 555 U.S. 305, 316 (2009) (An agency's "interpretation governs in the absence of unambiguous statutory language to the contrary or unreasonable resolution of language that is ambiguous.").

### III. Discussion

CSC Sugar first argues that because the 2020 AD Amendment makes substantively the same changes to the AD Agreement as the 2017 AD Amendment, Commerce's recordkeeping failure for the 2017 AD Amendment "is carried over to the

2020 record by reason of Commerce's implicit reliance on this tainted record." Pl.'s Br.
at 11. To the contrary, Commerce expressly clarified that it would rely on "only"
information placed on the record after October 18, 2019, the date of the court's decision
vacating the <u>2017 AD Amendment</u>. <u>See</u> Period for Rebuttal Comments, PD 51
("Commerce will only consider comments and factual information submitted to the official
records of these proceedings after October 18, 2019.").

      Accepting CSC Sugar's position that Commerce implicitly relied on information
from the 2017 proceeding would require the court to conclude that Commerce acted in
bad faith in conducting the 2020 proceeding. The law is clear that, absent "well-nigh
irrefragable proof," government officials are presumed to act in good faith in discharging
their duties. <u>McEachern v. Office of Personnel Management</u>, 776 F.2d 1539, 1544
(Fed. Cir. 1985). Yet CSC Sugar appears to contend that Commerce's procedural failure
in the negotiations over the <u>2017 AD Amendment</u> can never be remedied, maintaining
that "[e]ven if the details of those ex parte meetings were disclosed <u>now</u>, which Commerce
admitted it cannot do as part of the prior litigation, that would not vindicate CSC Sugar's
right to participate in the process <u>while the process is ongoing</u>." Pl.'s Br. at 13. The court
does not agree and rejects CSC Sugar's argument that the procedural defects of the 2017
proceeding somehow carried over to the 2020 proceeding.

      As for CSC Sugar's argument that Commerce improperly cloned the record of the
2017 proceeding for the 2020 proceeding, <u>see</u> Pl.'s Br. at 10–14, there is no dispute that
the changes in the 2020 AD Amendment are substantively the same as those in the <u>2017</u>
<u>AD Amendment</u>. Nevertheless, Defendant argues that "CSC is incorrect that the records

are substantively identical." Def.'s Resp. at 17. CSC Sugar ignores the crucial fact that it had the opportunity to develop the record of the 2020 proceeding through submission of comments, rebuttal comments, and factual information. See Comments on Suspension Agreement, PD 44; Rebuttal Comments, PD 58; Clarification of Rebuttal Comments, PD 65; Comments on Draft Amendments to Suspension Agreement, PD 85. This crucial fact undercuts Plaintiff's attempt to equate the 2020 proceeding with the 2017 proceeding. Cf. CSC Sugar II, 43 CIT at ___, 413 F. Supp. 3d at 1325 (explaining prejudice to CSC Sugar in 2017 Amendment negotiations, noting "Commerce's complete failure to follow § 1677f effectively prevented CSC Sugar from commenting on the ex parte materials and discussions Commerce engaged in during the AD Amendment negotiations.").

　　　Although certain information in the record of the 2020 proceeding was also in the record for the 2017 proceeding, this alone does not demonstrate that the procedural irregularity the court found in the 2017 proceeding carries over to the 2020 proceeding. CSC Sugar argues that information originally placed on the record of the 2017 proceeding is tainted and therefore should not be placed in the record of the 2020 proceeding. See Pl.'s Br. at 13. CSC Sugar's argument is predicated on the view that this Court passed on the merits of the information contained in the record of the 2017 proceeding. Plaintiff is mistaken. The reason for the court's order vacating the 2017 AD Amendment was Commerce's failure to memorialize ex parte meetings and no more. See CSC Sugar II, 43 CIT at ___, 413 F. Supp. 3d at 1326. Given Commerce's express commitment to consider solely information submitted after October 2019, see Period for Rebuttal Comments, as well as the fact that CSC Sugar had ample opportunity to participate and

comment on the new record, CSC Sugar has failed to demonstrate that "record supporting the 2020 Amendment is functionally the same as the record supporting the 2017 Amendment." <u>See</u> Pl.'s Br. at 10.

Aside from contending that the procedural defects of the 2017 proceeding should be imputed to the 2020 proceeding, Plaintiff maintains that the "2020 Amendment suffers from procedural irregularities related to timing, which also deprived CSC Sugar of important procedural benefits." <u>Id.</u> at 14–19. Specifically, CSC Sugar argues that Commerce rushed the 2020 proceeding, completing it in only six weeks, which left "simply no time (or willingness by Commerce) … to consider and address new information." Pl.'s Br. at 15. Plaintiff's contentions are not supported by the record. CSC Sugar does not argue that Commerce's swift completion of the 2020 proceeding violated any statutory or regulatory provisions. While Plaintiff contends that the proceeding did not provide adequate time for the submission and consideration of certain information, <u>see</u> Pl.'s Br. at 18, it did not press Commerce for additional time to cure any perceived procedural shortcomings or to submit additional information for the record, except for one instance. And, Commerce granted CSC Sugar's sole extension request. <u>See</u> Ext. for Comments on Amendments to Draft Suspension Agreements, PD 29. CSC Sugar has thus failed to demonstrate that it was deprived of any procedural safeguards regarding the information on the <u>2020 AD Amendment</u> record.

CSC Sugar also argues that "by statute and through practice, Commerce has a duty to publish appropriate notifications and to issue instructions to Customs that puts into effect its published decisions." Pl.'s Br. at 17. CSC Sugar notes that "Commerce held

off on issuing the instructions to vacate the 2017 Amendment by almost seven weeks.

Yet, it took only three weeks for Commerce to issue instructions to implement the 2020

Amendment." Id. Problematically, Plaintiff does not cite any statutes, regulations, or

practice that Commerce allegedly violated. Instead, CSC Sugar's contention appears to

be that Commerce must have acted in bad faith by delaying its instructions to Customs in

vacating the 2017 AD Amendment.[5] Commerce's instructions for the termination of the

2017 AD Amendment specifically state that "as of [December 7, 2019], the AD Agreement

. . . is in effect and applies to all contracts entered into after [December 7, 2019.]" See

Termination of Customs Instructions, PD 115.

Therefore, the delay in issuing the instructions did not impact the dates of the

contracts to which the original AD Agreement applied. Similarly, Commerce's instructions

for the 2020 AD Amendment were informational and state that "[t]he 2020 AD Amendment

---

[5] Plaintiff does cite to this Court's Order of December 6, 2019, in the related CVD action
in which the Court stated:

> This discrepancy in rationales indicates that the purpose of
> the stay is not to "permit an orderly transition to compliance
> with the Court's judgments," but instead to delay enforcement
> of the judgment until Commerce issues a "new" suspension
> agreement and tries to force Plaintiff to start an appeal anew.
> Without attempting to discern the "true" motivation for the stay
> of enforcement, it suffices to say that the difference in
> rationales asserted by the Defendant and the Defendant-
> Intervenors gives the court pause.

CSC Sugar II, 43 CIT at ___, 413 F. Supp. 3d at 1310 (Court No. 17-00214). Although
the court did express concern about the "discrepancy" in rationales for delay asserted by
Commerce and other interested parties, Plaintiff has not met its burden in demonstrating
any factual support that Commerce's delay was actually the result of bad faith.

applies to all contracts for Sugar from Mexico exported from Mexico on or after the signature date of the Amended AD Agreement, i.e., [January 15, 2020]." 2020 AD Amendment Customs Instructions, PD 118. Thus, even pursuant to the Customs instructions, the original AD Agreement applied to contracts for sugar from Mexico from the time of the termination of the 2017 AD Amendment to the signing of the 2020 AD Amendment. These facts make it difficult to accept CSC Sugar's hoped for inference that Commerce acted in bad faith in delaying its issuance of instructions to Customs.

Turning to the merits, CSC Sugar maintains that Commerce's adoption of the 2020 AD Amendment is unsupported by substantial evidence because "Commerce has provided no evidence to show why the 2020 Amendment's change in polarity standards are necessary in addition to the amendment's bulk-shipment requirement." Pl.'s Br. at 20. Plaintiff also argues that "the polarity standard adopted is contrary to law because Commerce must explain the 'connection between the facts found and the choice made.'" Id. at 21 (citing Elec. Consumers Res. Council v. Fed. Energy Regulatory Comm'n, 747 F.2d 1511, 1513 (D.C. Cir.1984)).

Plaintiff's argument that Commerce failed to provide a "reasoned explanation" for a change in the polarity threshold is misplaced. Commerce explained, throughout the negotiation of the 2020 AD Amendment, why the changes to the polarity thresholds for

Refined Sugar[6] and Other Sugar[7] coupled with the inclusion of the "bulk shipment" provision[8] for Other Sugar work in concert to "eliminate completely" the injurious effects of Mexican sugar imported into the United States. See 19 U.S.C. § 1673c(c); see also AD Price Suppression Memo, PD 100; AD Statutory Assessment Memo, PD 101; Sugar Comments Memo, PD 102. Specifically, during the negotiation of the 2020 AD Amendment, Commerce explained that modifying the polarity thresholds and including a bulk-shipping provision would help to address two critical issues: (1) diminished supply of raw sugar for United States cane sugar refiners; and (2) decline in United States price of Refined Sugar caused by exports of Mexican sugar into the United States. See AD Statutory Assessment Memo at 4–8 (explaining that "The change in the definition of Other Sugar in terms of polarity, and the requirement that Other Sugar is to be shipped in bulk, freely-flowing, ensure to the fullest extent possible under the amended Agreements that sugar that enters subject to the lower reference price is sold in the market segment of sugar that requires further processing."); Sugar Comments Memo

---

[6] "Refined Sugar" is defined as sugar at a polarity of 99.2 and above, as produced and measured on a dry basis. See 2020 AD Amendment.

[7] "Other Sugar" is defined as sugar at a polarity of less than 99.2, as produced and measured on a dry basis. See 2020 AD Amendment.

[8] The "bulk shipment" provision specifies that "Other Sugar must be exported to the United States loaded in bulk and freely flowing (i.e., not in a container, tote, bag or otherwise packaged) into the hold(s) of an ocean-going vessel." See 2020 AD Amendment. "To be considered as Other Sugar, if Sugar leaves the Mexican mill in a container, tote, bag or other package (i.e., is not freely flowing), it must be emptied from the container, tote, bag or other package into the hold of the ocean-going vessel for exportation." Id. "All other exports of Sugar from Mexico that are not transported in bulk and freely flowing in the hold(s) of an ocean-going vessel will be considered to be Refined Sugar for purposes of the Export Limit or Additional U.S. Needs Sugar, regardless of the polarity of that Sugar." Id.

at 5–8 ("The change in polarity definition, and the associated changes to the export limits in the 2020 CVD Amendment, will ensure that an adequate supply of raw sugar reaches cane refiners. Under the 2020 Amendments, lower polarity Mexican sugar will have increased availability compared to the original agreement and the higher input cost for sugar above 99.2 degrees polarity will prevent such Mexican sugar from supplanting sales of U.S. refined sugar. … The potential harm to CSC is uncertain and limited, while the potential benefits to the domestic industry as a whole are substantial. For these reasons, we do not find CSC's arguments persuasive and we believe that the changes to the polarity definitions, and other provisions of the 2020 Amendments, are justified."). Accordingly, Commerce reasonably explained why the polarity modification was necessary along with the bulk-shipping provision.

With respect to CSC Sugar's substantial evidence challenge, to prevail on a substantial evidence challenge to Commerce's determination to include both the polarity threshold modification as well as the bulk-shipping requirement, CSC Sugar needed to demonstrate that the record supports one, and only one, reasonable outcome: that the bulk-shipping requirement "entirely eliminated" the injurious effect of the imported sugar and that the polarity threshold change was redundant and unnecessary. See Tianjin Wanhua Co. v. United States, 41 CIT ___, ___, 253 F. Supp. 3d 1318, 1328 (2017) (emphasizing that claimants challenging Commerce's determinations that choose among various options must demonstrate that their position is the "one and only reasonable" option on the record); Mitsubishi Heavy Indus. Ltd. v. United States, 275 F.3d 1056, 1062 (Fed. Cir. 2001) ("'[T]he possibility of drawing two inconsistent conclusions from the

evidence does not prevent an administrative agency's finding from being supported by substantial evidence.'" (quoting <u>Consolidated Edison, Co. v. NLRB</u>, 305 U.S. 197, 229 (1938))). Plaintiff does not explain how its preferred outcome is the one and only reasonable choice on the record. <u>See</u> Pl.'s Reply at 14 n.8. It just offers a conclusory assertion that the bulk shipment requirement rendered the polarity modification superfluous. Although CSC Sugar presented this argument to Commerce, other parties (including Defendant-Intervenors) also responded with their own arguments and information. <u>See, e.g.</u>, ASC Rebuttal Comments at 10, PD 59, CD 11 (contending that "[w]ithout both provisions, the likelihood that such sugar bypasses refiners at the lower reference price increases"). Commerce directly addressed why it found both the bulk shipment provision and polarity modification necessary, explaining:

> In our statutory memoranda, we identified distinct problems with the functioning of the original agreements and explained how the changes contained in the 2020 Amendments address those problems. We noted that ASC alleged that U.S. cane refiners were receiving a diminished supply of sugar for their processing operations and that imports of Mexican sugar were undercutting U.S. sugar prices. Specifically, ASC alleged that Mexican "estandar" sugar was being sold for direct consumption at low prices, thus supplanting sales of refined sugar. The shipping requirements in the 2020 Amendments directly increase the likelihood that U.S. cane refiners will receive sufficient amounts of sugar for their operations, and all interested parties, including CSC, seem to agree on this point. The change in polarity definition, which effectively establishes a price increase for sugar with a polarity between 99.2 and 99.5, helps prevent price suppression or undercutting. The changes contained in the 2020 CVD Amendment support both objectives through quantitative restrictions that allow relatively more Other Sugar for U.S. refining operations and further restrict the amount of Refined Sugar (including sugar with a

> polarity between 99.2 and 99.5) in the U.S. market. We also
> explained that the change in polarity definition facilitates
> monitoring and verification. The changes contained in the
> 2020 Amendments work in concert with each other to ensure
> that, to the fullest extent possible, the 2020 Amendments
> meet the statutory requirement to "eliminate completely" the
> injurious effects of exports.

Sugar Comments Memo at 6; see also id. at 7 ("the changes to the polarity definition are

intended to address market conditions caused by Mexican sugar imports and to eliminate

completely the injury to the domestic industry caused by such imports. The changes are

not intended to 'undercut the business model' of CSC." (citing AD Price Suppression

Memo at 8)). Commerce thus explained its determination based on information in the

record. Accordingly, the court sustains the 2020 AD Amendment (including the polarity

modification) as reasonable (and therefore supported by substantial evidence).

Lastly, CSC Sugar contends that "Commerce failed to adequately address the

public interest as required by 19 U.S.C. § 1673c(a)(2)." See Pl.'s Br. at 23–26. The record

does not support CSC Sugar's argument, as Commerce explained why the 2020 AD

Amendment is in the public interest based on its analysis of the criteria in 19 U.S.C.

§ 1673c(a)(2)(B). See AD Statutory Assessment Memo at 8–11; Sugar Comments Memo

at 10–11.

19 U.S.C. § 1673c(a)(2)(B) provides that in evaluating whether a quantitative

restriction agreement (such as the one included in the 2020 AD Amendment) is in the

public interest, Commerce shall consider:

> (i)      whether, based upon the relative impact on consumer
>          prices and the availability of supplies of the
>          merchandise, the agreement would have a greater

<blockquote>
adverse impact on United States consumers than the imposition of antidumping duties;

(ii)     the relative impact on the international economic interests of the United States; and

(iii)    the relative impact on the competitiveness of the domestic industry producing the like merchandise, including any such impact on employment and investment in that industry.
</blockquote>

19 U.S.C. § 1673c(a)(2)(B). CSC Sugar does not argue that the public interest is better served by terminating the suspension agreement and issuing an antidumping duty order. See Pl.'s Br. at 23–26; Pl.'s Reply at 17–18. Rather, it contends that the terms of the 2020 AD Amendment (namely, the quantitative restriction agreement) are structured in a manner that precludes the 2020 AD Amendment from being in the public interest, unlike the original AD Agreement.

As to the first factor, Commerce noted that the 2020 CVD Amendment limits the supply of Mexican sugar and revises the export limit ratio of "Other Sugar" and "Refined Sugar," which helps (1) to reduce the likelihood that sugar from Mexico will oversupply the United States market, and (2) to support price stability for consumers in the United States. See AD Statutory Assessment Memo at 4–5, 9. Commerce explained that "higher minimum reference prices in the amended AD Agreement work in conjunction with these provisions in the amended CVD Agreement to ensure that prices for the first U.S. sale cannot be set so low as to cause injury to the U.S. industry." Id. at 4. Commerce found that the impact of either the 2020 AD Amendment or the imposition of duties helps to ensure that consumer prices for sugar are at market prices for fairly traded sugar. Id. at 9.

Consequently, Commerce determined that the <u>2020 AD Amendment</u> does not have a greater adverse impact on United States customers than the imposition of antidumping duties. <u>Id.</u> at 10–11 (explaining benefits of <u>2020 AD Amendment</u> as compared to antidumping duty order).

With respect to the second criterion, the <u>2020 AD Amendment</u> helps to prevent unfairly traded imports of sugar while also promoting trade with Mexico, one of the United States' closest trading partners. <u>See</u> AD Statutory Assessment Memo at 10. In simultaneously eliminating injury to the United States industry caused by imports of Mexican sugar and promoting trading relationships, Commerce found that the <u>2020 AD Amendment</u> promotes the international economic interests of the United States. <u>Id.</u>

CSC Sugar primarily challenges Commerce's analysis with respect to the third factor, which requires Commerce to assess "the relative impact on the competitiveness of the domestic industry producing the like merchandise." 19 U.S.C. § 1673c(a)(2)(B)(iii); <u>see</u> Pl.'s Br. at 25–26. Plaintiff argues that "although Commerce spills much ink across multiple memoranda under headings entitled 'public interest,' in substance those discussions are really about the domestic industry's interest—and making the largest companies in the domestic industry more profitable (although Commerce prefers to refer to this as being "more competitive")—to the exclusion of the general public's interest." <u>Id.</u> at 25. Plaintiff also maintains that "even with respect to <u>just</u> the domestic industry, Commerce still failed to address the full effect on the domestic industry, including CSC Sugar—and the 2020 Amendment's potential consequences to it." <u>Id.</u> at 26.

CSC Sugar argues that the statute requires Commerce to examine competition within the U.S. industry, as well as the public interest as a whole. During the proceeding, Commerce explained that "antidumping and countervailing duty laws are primarily concerned with the pricing behavior of foreign producers, the prices of foreign imports, and the impact of such imports on the U.S. domestic industry." See Sugar Comments Memo at 10. Accordingly, Commerce interpreted the phrase "competitiveness of the domestic industry" to refer to the competitiveness of the domestic industry as a whole in relation to foreign imports and foreign producers of subject merchandise. Id.

Plaintiff contends that "Commerce has no special expertise or knowledge in determining what the term 'public interest' means as a matter of law." Pl.'s Br. at 24. However, Plaintiff does not challenge Commerce's interpretation of § 1673c(a)(2)(B) with any reference to the legal framework that the court uses to resolve challenges to Commerce's statutory interpretations (i.e., Chevron). See generally Pl.'s Br. To the extent that Plaintiff seeks to challenge Commerce's interpretation of § 1673c(a)(2)(B), the court deems this argument waived as Plaintiff has failed to make this argument with any reference to the proper legal framework. See Nan Ya Plastics Corp. v. United States, 810 F.3d 1333, 1347 (Fed. Cir. 2016) (observing that Plaintiff failed to make its statutory interpretation "arguments within the operative Chevron framework. That misstep typically warrants a finding of waiver." (citing United States v. Great Am. Ins. Co., 738 F.3d 1320, 1328 (Fed. Cir. 2013) ("It is well established that arguments that are not appropriately developed in a party's briefing may be deemed waived.")); see also Zhejiang Sanhua Co. v. United States, 39 CIT ___, ___, 61 F. Supp. 3d 1350, 1358 (2015) (citing Great

American Insurance in holding that a party waived its arguments for failing to raise them within the operative Chevron framework); JBF RAK LLC v. United States, 38 CIT ___, ___, 991 F. Supp. 2d 1343, 1356 (2014) (same). Accordingly, the court will not address Plaintiff's arguments that Commerce failed to properly interpret § 1673c(a)(2)(B) in adopting the 2020 AD Amendment, and instead address Plaintiff's argument that Commerce failed to reasonably apply the statute in adopting the 2020 AD Amendment.

In applying the third factor to the instant record, Commerce found that the 2020 AD Amendment would have a positive impact on the competitiveness of the domestic industry, including CSC Sugar. See Sugar Comments Memo at 10. Specifically, the signatory producers/exporters of the 2020 AD Amendment have agreed to revise their prices of subject merchandise to "eliminate completely" the injurious effect of Mexican sugar imported into the United States. Id. Additionally, Commerce found that the amended definitions of "Refined Sugar" and "Other Sugar" ensure an adequate supply of input material is available to the United States industry for further processing, a crucial benefit that Commerce determined could not be guaranteed with an antidumping duty order. See AD Statutory Assessment Memo at 9. As a result, Commerce found that the public interest as a whole was served. Accordingly, the court sustains Commerce's determination that the 2020 AD Amendment met the public interest criteria of § 1673c(a)(2)(B).

## IV. Conclusion

For the foregoing reasons, Plaintiff's motion for judgment on the agency record is

denied. Judgment will be entered accordingly.


                                                    _____/s/ Leo M. Gordon_____
                                                         Judge Leo M. Gordon


Dated:  June 25, 2020
           New York, New York